NORTHERN STATES POWER COMPANY, a corporation, Plaintiff and Appellant,

v.

Jerome EFFERTZ, Bessie M. Effertz and E. C. Wralstad, Defendants and Respondents, Defendants and Appellants.

NORTHERN STATES POWER COMPANY, a corporation, Plaintiff and Appellant, Plaintiff and Respondent,

v.

Thomas R. DOYLE, also known as T. R. Doyle and Hubert Doyle, Defendants and Respondents, Defendants and Appellants.

NORTHERN STATES POWER COMPANY, a corporation, Plaintiff and Appellant, Plaintiff and Respondent,

v.

Theodore R. HARNESS and Sophie Harness, H. L. Hunt, Eugene Golly, Administrator of the estate of Geo. Sigman, deceased, Anna M. Miller, Defendants and Respondents, Defendants and Appellants.

NORTHERN STATES POWER COMPANY, a corporation, Plaintiff and Appellant, Plaintiff and Respondent,

v.

Ole HARNESS, Borghild Harness, and Sohio Petroleum Company, Defendants and Respondents, Defendants and Appellants.

NORTHERN STATES POWER COMPANY, a corporation, Plaintiff and Appellant, Plaintiff and Respondent,

v.

Oscar N. JOHNSON, Marcella Johnson, Aurelia King, British-American Oil Producing Co., Huston Huffman, J. P. Wemple, North Central Oil Corporation, D. W. King and Amelia King, Defendants and Respondents, Defendants and Appellants.

NORTHERN STATES POWER COMPANY, a corporation, Plaintiff and Appellant, Plaintiff and Respondent,

v.

Kermit WHITTED and Ruby Whitted, Defendants and Respondents, Defendants and Appellants.

NORTHERN STATES POWER COMPANY, a corporation, Plaintiff and Appellant,

v.

Lyle WHITTED and Marion Whitted, Defendants and Respondents, Defendants and Appellants.

Nos. 7733–7739.

Supreme Court of North Dakota.

Dec. 29, 1958.

Rehearing Denied Jan. 28, 1959.

Palda, Palda & Peterson, Minot, for plaintiff and appellant and plaintiff and respondent.

Ilvedson, Pringle, Herigstad & Meschke, Minot, and Victor V. Stiehm, Towner, for defendants and respondents and defendants and appellants.

BURKE, Judge.

These appeals are from judgments entered in seven condemnation cases brought by the plaintiff pursuant to Chapter 32–15, NDRC 1943, to condemn a right of way for an electric power transmission line over and across lands owned by defendants. By agreement of the parties all of the actions were consolidated for trial and the issues of necessity and of damages were tried separately. Upon the trial of the issue of necessity the trial court found that the taking of the property was necessary for the use intended and upon the trial of the issue of damages, by the court and a jury, verdicts and judgments in favor of the respective defendants were returned and entered. The defendants have appealed from the parts of the judgments which decree necessity and the plaintiff has appealed from the parts of the judgments which award damages. Plaintiff has also appealed from an order denying its motion for a new trial.

The line in question is a 105,000 volt power transmission line 26 miles in length extending northwesterly from a power generating plant at Velva, N. D., to Minot, N. D. The route followed by the line crosses over the lands of the defendants. The defendants stipulated that the construction of the transmission line was necessary and that some property must be acquired by the plaintiff for such proper public use. They agreed that the procedure followed by the plaintiff was in all respects in accordance with law. They challenged only the judgment of the plaintiff in selecting a route for the line. They urged in district court and now urge here that the route selected violates the provisions of Section 32–1506, NDRC 1943, which provides, " * * * it (the route) must be located in the manner which will be compatible with the greatest public benefit and the least private injury * * *." They offered an alternate route which they say would comply with the statutory requirements.

It is agreed that the proper location for the transmission line lies somewhere between the railway of the Soo Line and the Surrey cut off of the Great Northern Railway which, from the vicinity of Velva to the vicinity of Minot, parallel each other at a distance of about seven miles. The engineers of the plaintiff testified that, because of the communications transmission lines located upon or near the railway rights of way, they were confronted with a serious problem with respect to inductive interference. If the 105,000 volt transmission line were located too close to the communications lines it would induce stray voltage or currents in such lines with the result that the use of such lines for communications would be interrupted. They testified that, after a full and careful consideration of this problem, and after consultation with the induction coordinating engineers of the Northwestern Bell Telephone Company and both railway companies, they mapped out an area between the two railways within which the power transmission line might be built. They also laid out three possible routes for the proposed transmission line within that area and one of these routes, the one now in question, was adopted by the plaintiff by corporate resolution. They also testified that a route which was not within that general area would not be satisfactory.

The alternate route proposed by the consulting engineers and expert witnesses for the defendants was not within that area. It more closely followed the right of way of the Soo Line. Its distance from the railway varied from 4,000 feet to 8,000 feet. Defendants' experts testified that this distance was sufficient as in their opinion inductive interference from a line so located would be within allowable limits. Defendants also offered evidence to the effect that their proposed route was for the most part across pasture land which had a value of from ten to twenty dollars an acre while the plaintiff's route crossed crop land which had a value of from forty to sixty dollars an acre.

An induction coordinating engineer from the chief engineer's office of the Northwestern Bell Telephone Company testified that the route proposed by the plaintiff was satisfactory and that inductive interference on the route proposed by the defendants could probably be controlled by the installation of short circuit relay protectors. He testified that these protectors were expensive and that their use was a source of danger to workmen on the lines. He also stated that because of the critical necessity of maintaining communications into Minot he would not agree to defendants' proposed location of the line.

 When the necessity for the exercise of the power of eminent domain is proved or admitted, much latitude is given to the corporation, vested with the power, in the selection of the site or location to be taken for public use, and generally, where there has been a carefully considered, good faith selection of a location by the corporation or its officers, the courts will not interfere. Northern Pac. R. Co. v. Boynton, 17 N.D. 203, 115 N.W. 679; Otter Tail Power Co. v. Malme, N.D., 92 N.W. 2d 514. Here the evidence clearly demonstrates a carefully considered good faith selection of the route for plaintiff's power transmission line. Defendants have suggested another route which they say will do just as well, will be cheaper, take less land out of production and will do less damage to land owners. The evidence, however, discloses a very serious difference of expert opinion as to whether the route proposed by defendants is scientifically acceptable. There is no such difference of opinion as to the route selected by plaintiff. We see no reason to attempt to resolve this difference of opinion. We assume it is a good faith difference between trained scientists and the mere fact that it exists in the case of one route and not in that of the other route demonstrates the practical wisdom of the plaintiff's selection. The judgments of trial court decreeing the necessity for the taking are therefore affirmed.

Upon plaintiff's appeal, the sole question is whether the damages awarded to the defendants are excessive. The interest sought to be condemned by the plaintiff is an easement upon a strip of land seventy-five feet wide extending across certain described lands belonging to the respective defendants for the purpose of erecting the power transmission line. This line is to be supported by structures of H frame construction. Each structure consists of two wooden poles, placed 14½ feet apart, supporting a horizontal cross arm or cross arms approximately 30 feet in length upon which will be carried the wires of the transmission line which at no point will be closer to the ground than 27 feet, 9 inches. These structures are located from 600 feet to 800 feet apart as shown by the exhibits. The easements also include the right to enter upon the described parcels of land for the purpose of patrolling, repairing and improving the line and the right to remove all trees or structures located upon the said parcels which in the opinion of the plaintiff will interfere with the transmission line.

 As has been stated plaintiff's appeal is both from the judgment and from an order denying a new trial. The motion for a new trial was made upon the ground, among others, that the damages awarded were not supported by credible evidence and were so large in amount that it must appear that the jury were actuated by passion and prejudice. A motion for a new trial upon this ground is addressed to the judicial discretion of the trial court and the trial court's decision thereon will not be upset upon appeal unless an abuse of that discretion is shown. Montana-Dakota Utilities Co. v. Culver, N.D., 80 N.W.2d 541; Montana-Dakota Utilities Co. v. Amann, N.D., 81 N.W.2d 628.

The jury awarded consequential or severance damages as well as damages to the 75 foot strip subjected to the easement. In our consideration of the evidence of damage we turn our attention first to the

testimony relating to the 75 foot strip. In the case against Jerome and Bessie Effertz this strip crosses three quarter sections of land. In two of the quarters there are three H pole structures and in the other quarter there are four. These structures are 700 or more feet apart, the greatest distance between the structures being 835 feet and the least distance 700 feet. The area occupied by the strip across all three quarters is 12.79 acres. It is all crop land. Mr. Van Sickle a qualified expert called by the defendants testified that the damage to the 75 foot strip as a result of the easement was $384. Mr. Maercklien another expert called by the defendants testified that the damage was $485. Plaintiff's experts included, in their estimates of damages, other elements of damage than the reduction in value of the 75 foot strip so that their testimony is of no particular value on this question. The defendant himself testified that the damage to the 75 foot strip was $1,600. The jury found the damages to be $831.35 or roughly twice as much as the average of the amounts testified to by defendants' experts. The verdict, however, is supported by the defendants' own testimony if that testimony is credible. The defendant arrived at the figure of $1,600 by valuing the 75 foot strip at $150 an acre before the taking of the easement and at $25 an acre after the taking. He purchased the three quarters in 1954, paying slightly less that $50 an acre for them. He testified that the value of all the land taken together was $75 an acre now, but that the strip described in the easement was worth twice that amount and the rest of the land worth less. The testimony offered by the defendants on the trial of the question of necessity was that the lands over which the transmission line was routed were worth from $45 to $60 an acre.

■ Ordinarily an award in a condemnation case will be sustained if it is within the limits of damages testified to by the witnesses. Bigelow v. Draper, 6 N.D. 152, 69 N.W. 570. However, this rule has its exceptions. Where the verdict is so flagrantly against the weight of the evidence that it appears that the jury were actuated by bias or prejudice the verdict will be set aside. 18 Am.Jur. (Eminent Domain, Sec. 376) 1018, 1019. See Carpenter v. Village of Dickey, 26 N.D. 176, 143 N.W. 964; Waterman v. Minneapolis, St. Paul & S. S. M. R. Co., 26 N.D. 540, 145 N.W. 19.

In considering this question, we must bear in mind that the only interest that is being condemned is a right of way and that the defendants are not being deprived of the use of the land for agricultural purposes. Upon the three quarter sections of the defendants Jerome and Bessie Effertz there will be ten structures of two poles each. The poles in each structure are 14½ feet apart and the structures average 750 feet apart. At the site of each structure there will be only a very small area that cannot be cultivated. It is true, that the presence of the poles will make the farming of the whole tract more difficult. This damage is a consequential damage however, to be considered in estimating the damage to the whole farm unit and the evidence discloses that it was considered in estimating such damage. If ten feet clearance is allowed around the poles the area taken out of production at each structure would be 20 feet by 34.5 feet or 690 square feet. For ten structures it would be 6,900 square feet or less than one sixth of an acre. These figures are not intended to be authoritative. They are merely illustrative. Even if it be considered that an area six times as great would necessarily be taken out of production the total would amount to less than an acre or less than one twelfth of the area included in the easement.

In view of the whole record we are of the opinion that Jerome Effertz's testimony that the land as a whole, for which he paid $50 an acre in 1954, is now worth $75 an acre; that the 75-foot strip across this land, described in the easement is worth $150 an acre and will be diminished in value 83⅓%

by the construction of the transmission line, expresses such a rash and biased opinion that it is not entitled to credit. Mr. Maercklien one of the experts for defendants testified that the strip was worth $58 an acre before the taking of the easement and $19.33 after the taking. Mr. Van Sickle also an expert witness for defendants testified that the strip was worth $60 an acre before the easement and $30 an acre afterwards. As a witness upon the hearing to determine necessity Mr. Effertz testified as follows:

"Q. Mr. Effertz, I don't think I asked you the difference in value per acre, fair market value per acre of your pasture land that runs along—which the alternate route would run and your land over which the proposed route would run?"

"A. This pasture land is worth ten dollars an acre, whereas the tillable land is worth at least $60.00 an acre."

With respect to the Ole Harness tract the situation is even more extreme. The transmission line crosses three quarter sections of his land. There are four H pole structures in each of two quarters and two in the third quarter. He testified that the over-all value of his land was $65 an acre but that the value of the 13.30 acres of land in the 75 foot strip was $150 an acre before the taking of the easement and that it would be only $25 an acre after the taking. Defendants' experts Van Sickle and Maercklien testified that the damage to the 75 foot strip by taking of the easement would be $399 and $372 respectively. The jury's verdict, in the sum of $864.50, thus allowed defendant damages in more than twice the amount testified to by his own experts.

The 75 foot strip across the Thomas Doyle tract comprises 8.50 acres of which 2.50 acres are pasture land. In this strip are 7 H pole structures. Doyle testified that the damage to the strip would be $467.-50. His experts testified to $202.50 and $173 respectively and the jury found the damage to be $515. Thus the jury's verdict was for more than twice as much as the amount set by the experts and 10% more than the amount to which Doyle himself testified.

■ We believe that our review of the evidence thus far demonstrates that the verdicts are so flagrantly against the weight of the evidence that they must have been rendered under the influence of bias or prejudice. We therefore consider it unnecessary to detail the evidence in the cases of the other defendants, except to say that in each case the jury found damages to the land described in the easements in an amount which was more than twice the amount set by defendants' own expert witnesses.

■ We also consider it unnecessary to review the evidence and the verdicts relating to consequential damages. A finding of bias or prejudice with respect to part of a verdict taints the whole verdict and makes a new trial upon all issues of damages necessary. Waterman v. Minneapolis, St. Paul & S. S. M. R. Co., 26 N.D. 540, 145 N.W. 19.

■ We have had occasion to review upon appeal several eminent domain cases in which easements for rights of way for electric power transmission lines have been condemned. In each of these cases damages were assessed by computing the damage to the land under the transmission line or to the land specifically described in the easement and the damage to the rest of the land in the owner's farming unit separately. As a result we have come to the conclusion that there is a very serious question as to whether it is practicable to assess damages in these cases in this manner. When Section 32–1522, NDRC 1943, was originally adopted as Section 5965, NDRC 1895 such projects were not within the contemplation of the legislature. Nevertheless it provided that the rule, that compensation for the property actually taken and for damages to the land not taken should

be assessed separately, should not be such a hard and fast rule that it had no exceptions. Subsection 5 of Section 32–1522, supra provides:

"*As far as practicable,* compensation must be assessed separately for property actually taken and for damages to that which is not taken."

 This section clearly vests the courts with a discretion, in proper cases, to substitute another method that will insure adequate compensation to the land owner. The method of separate assessments applies practicably in cases where the land condemned is actually taken, either in fee, or by an easement which destroys its availability for use by the land owner, as in the case of rights of way for railways or highways. In such cases there is an actual severance of the property condemned from the rest of the owner's land. Where a right of way across farm land is condemned for a power transmission line, the only land that is completely taken is that where the line posts are actually set. The rest of the land remains available for farming, subject of course to the difficulties which the presence of the posts entails. In such cases there is no actual physical severance of land and we are of the opinion that an attempt to evaluate the interest taken in a narrow strip which is sometimes described as being 100 feet wide, 75 feet wide or 50 feet wide, separately from the damage to the remaining interest, may confuse juries and result in unequal or excessive damages. Whether the transmission line crosses a 160 acre tract or a 40 acre tract, it would be simpler, less confusing, or in other words much more practicable to award compensation upon the basis of the damage done to the tract, crossed by the line, and separate damages, if any, to the remainder of the farm unit. The damage to the tract, whatever its size, would simply be the difference between its reasonable market value before the building of the line and its reasonable market value thereafter. Such an award would give the land owner full com-

pensation without requiring the jury to make difficult, confusing and sometimes impossible computations. Because new trials are necessary in these actions we have deemed it proper to call attention to the trial court's discretion in such cases.

The judgments of the district court in these actions are reversed and new trials granted.

GRIMSON, C. J., and MORRIS and SATHRE, JJ., concur.